Paul Turner May it please the Court, my name is Paul Turner. I'm with the Federal Public Defender Office in Las Vegas, Nevada. I'm here this morning to represent Steve Cox. I'd like to reserve about three minutes for rebuttal, Your Honor, and I'll try to watch the clock. You certainly may do so. We allowed 20 minutes in this case, although we're not entirely sure if each side needs the full 20 minutes, but be guided accordingly. I understand, Your Honor. Obviously, my main reason being here this morning is to respond to the concerns of the Court about this case. Having said that, I would prefer to start my presentation today with the issue dealing with sentencing, the Ground 5e of the amended petition, our argument that Mr. Cox was denied the effective assistance of counsel at his first degree murder sentencing in this case. As the Court is undoubtedly very well aware, Mr. Cox has a long history that's now well-documented of mental disease. Bizarre thinking, I think, would be a good way to put it, although I guess from a technical point of view, you might not say that. He had, I digress, say Mr. Cox thought he had discovered a way of saving society from cocaine, which if true would have been a wonderful discovery. Unfortunately, as far as at least I know this morning, nothing that Mr. Cox had come up with has ever helped anybody or proved to be true. He believed it was true. I think the record's clear about that. He thought he had developed something called an arc light so that he could somehow tell the dangerous properties of cocaine and separate them from other properties that in his mind weren't dangerous. But your concern has to be here to establish ineffective assistance of counsel. It was a total dereliction of the duty to investigate. Correct, Your Honor. And the failure to offer mitigating circumstances or mitigating evidence. Now, isn't the record full of indicia that there was investigation by this counsel and, indeed, mitigating facts were brought to bear, but Mr. Cox kept refuting them? Your Honor, you're absolutely right.  Unfortunately, it's missing the one piece of information that really counted at sentencing, namely that Mr. Cox could be treated, that he could be rehabilitated, that his future dangerousness of Mr. Cox could be minimized, could be removed. That was the critical item at sentencing, distinguishing life without. And life without, and we had a hearing four years ago in this case, and I said it back at that time and I'll say it again, life without is life without hope. You've drained hope out of somebody when you give them a life without sentence. It's very, very different from other sentences. Mr. Cox obviously had an alternative possible sentence of life with the possibility of parole, a chance to convince a parole board that he had been rehabilitated and that with proper medication he could live a normal life in society. He had he lost that opportunity when his lawyer didn't present any evidence, any evidence, of his rehabilitative potential. And we've come forward with Dr. St. Martin's report in this case, which clearly indicates that Mr. Cox could have been treated, that this problem could have been reduced, and that his dangerousness could have been largely eliminated. The Court never knew that. It's also extremely important to note here that the Department of Parole and Probation in Nevada recommended in the pre-sentence report a life with sentence. So this lawyer went into the sentencing with the best piece of information a lawyer could have at that point, a recommendation from the State of Nevada for a life with the possibility of parole sentence. A lot of lawyers would dream of having that in cases like this. But he came out with a life without sentence. He came out with it because he didn't do his job. He failed miserably to represent his client in this case. Was the recommendation of life with before the sentencing judge? Yes, it was, Your Honor. It was in the pre-sentence report. In fact, actually, there are two pre-sentence reports in this case. And I think I'm derelict. I think I only presented one in our excerpts. There actually were two because there were two sentences. The case had come back for sentencing by the judge. And in both, they recommended life with the possibility of parole. The Court knew, obviously, Your Honor, it's totally correct. The Court was very familiar with Mr. Cox. And the judge was obviously concerned about dangerousness. And I submit again that if the Court had had the correct evidence that Dr. St. Martin would have been able to present or any equivalent expert, the judge on our judgment would have very likely gone the other way with a life with sentence. The judge well knew that Steve Cox was quite different from a typical defendant. He noted actually at sentencing that Mr. Cox had had a less than normal view of what the world really was. Mr. Cox lacked connection to reality. Mr. Cox had delusions. But again, the critical thing here is that you can be treated for delusions. You can be healed of that problem. And the judge was never told that. He certainly should have been told that. That, in our judgment, means that Mr. Cox should get another sentencing hearing. And that's the remedy that we're asking the Court for, is another chance at a sentencing where the whole truth can be presented to the judge. It's that straightforward on that issue. But I very much would welcome questions from the Court, because I want to be sure that we've made our point as clear as we can. No questions, counsel. I know the judge, your inquiry is very pertinent, Your Honor. I know how important prejudice is in proving this claim. And I know that that's been an issue in a number of your cases. And I would submit to you that this is clearly a case of prejudice, with this distinction between life with and without, and with that one critical fact not in the record. I'll move to the other issue, Your Honor. Mr. Cox, as the Court is well aware, this case has a lot of very interesting facts, most of which maybe are not relevant this morning. But just a little bit of background. Mr. Cox had come to Las Vegas in a battered vehicle with a windshield, the right side of the windshield smashed out. And this is quite interesting. There were 11 dogs with him, 11 pit bulls, two adults and nine puppies. Hardly facts that normally go with a murder case, but quite interesting and quite important, I think. Once again, reflecting that Mr. Cox is quite different from a normal defendant. After the matter and the incident in Las Vegas, he was out on the road heading toward Memphis, Tennessee, to try to reconnect with family there and change his life somewhat. He thought he was escaping from people who were trying to harm him. When he was stopped by the, excuse me, the Arizona Highway Patrol, they gave him his Miranda warnings, and he made a damaging statement at that point that suggested that he indeed had had contact with the victim of this crime. I would submit to you, and we have certainly asserted, that Mr. Cox was not in a mental condition at that point to give a voluntary statement, that he was also not capable of waiving his Miranda rights, and that that, those statements should never have been admitted against him. A few days later, he is now in the Holcomb, Arizona, jail. And he's in Holbrook. I'm sorry, Your Honor. Holbrook. Holbrook. I apologize, Your Honor. He is in the jail, and he is visited by police officers from Nevada who, again, attempt to question him. They give him his Miranda warnings. He does not. This time, he doesn't answer their questions, so they go back to Nevada. He stays in jail for two months. I think that's a very important fact here. This man's in jail for two months in Arizona. Now, we ratchet it forward to May of 1990, and he is being returned to Las Vegas to face this matter. And two officers from the North Las Vegas Police Department come down to Nevada to Arizona. And here are the facts that count the most in my judgment. They walk in to see this man. The first thing they do is give him a Miranda warning. It's in the preliminary hearing. They give him a Miranda warning then. They remove him from the jail to the police car. Guess what? They give him another Miranda warning. Two Miranda warnings have now been given to this man before they even start this trip. Also, they indicate to him, according to their testimony, that, and this is very odd to me, they indicate to him, we're not going to ask any questions. That's very interesting. They've just given him two Miranda warnings, and now they're telling him we're not going to ask any questions. I'm not sure where you're going with this, counsel, because the issue, as I understand it, is whether or not a sua sponte examination with respect to the statements he made on the initial event are required. By initial event, you're talking about the Arizona Highway Patrol matter? Yeah. Well, aren't those the statements that you contend should have been excluded? I've actually contended, I believe, Your Honor, that's certainly one of the statements, that the statement in the police car later should have been excluded also. I believe. But on a competency basis? In the interval, he had already exercised his right not to answer questions. Right. He had at that one point, Your Honor. Okay. Whether that, what that indicates, obviously, I don't think it means that Mr. Cox is mentally healthy at that point, but for whatever reason, he did exercise that right. But then, the third time, he's now in a police car, and he's in there for 10 to 11 hours. And I would submit that that's a very coercive atmosphere, to be in a police car for 10 or 11 hours with two police officers who have given you Miranda warnings and have told you they're not going to ask you any questions. I think the subtle message there is we want some information from you, and we hope you'll talk to us. I think they knew he was going to talk to them. I digress and also say that in Dr. St. Martin's report, the Court will see that one of the problems of Mr. Cox's mental illness here is that he had a proclivity to talk a lot, that that was an aspect of his mental illness. And that's very, in fact, he testified at the trial, didn't he? He did, Your Honor. And admitted that he killed her. He did. He testified for, actually, I don't know if I'd say he admitted he killed her, but he came. He described circumstances under which her life was taken. He did. He did. He testified, actually, and this is interesting, for about two hours without stopping, literally. The only thing that stopped him was the prosecutor, who finally, I guess, just got worn out by the whole thing and suggested maybe somebody should ask him a question. He literally testified for about two hours without responding to a question, just a narrative. What does that do to any claim about the coerciveness of the 10-hour car ride? Our position, Your Honor, is that he never would have testified, or at least it would have been much less likely he ever would have testified if he'd never given these earlier statements. You'd like to think that an effective lawyer would have stopped him in some way. And obviously, we had a claimant here on that subject, I might add, and I don't want to improperly we lost it on a procedural basis. But that's our position as it connects back to this. So our argument basically is that Mr. Cox could not have voluntarily given any of these statements. They were all a product of mental disease. And he was in a coercive environment from the time the Arizona troopers originally stopped him through the jail, through 10 or 11 hours in the police car, over a period of about two months, and that those statements should at least have been addressed. Our problem here, and the bottom line of it is, is that we never got a hearing. He never had any hearing. And the court, we say, should have sui sponte given him one. Right. One reason we say that, maybe the most important, is that the court sui sponte did a competency hearing. No one asked for the competency hearing. His own lawyer never asked for it. The court sui sponte ordered the competency hearing. If the judge can sui sponte order a competency hearing, why shouldn't he have sui sponte addressed this subject? He obviously saw something here. I think a fair reading of Jackson v. Deno in this context, and this Court has held that you have that obligation. I think in the Mendiola, Commonwealth of. We're under AEDPA, right? Yes, Your Honor, you are. But I think the Court, this Court, interpreted and applied Jackson v. Deno in this context. I don't know of any Supreme Court case directly involving identical facts to this case. But I did file a 28J letter on that Panetti v. Quarterman case recently, and I think that case, Justice Kennedy, I think he's made very clear in the Court in that 5-4    facts to this case. It's very clear that you look to the general principles of law, and they can be applied to different factual patterns. You don't need to have a blue car in each case or the same red car. You can have some different kinds of things. That as long as that general principle of law is the same, and we would say it is here, we argued, and I think the case we have argued that should be applied is the Johnston v. Zerbst, because Zerbst is a very important case, as Your Honors all know. It establishes the protective duty of the court. In that case, I believe the person was waiving their right to counsel. That's obviously a critical right. This is a critical right, too. Waiving your right not to speak, your Fifth Amendment right not to speak, is very critical. And we think Johnston is clearly established Federal law that does control this case, and we think this Court's opinion in the Mendiola, I believe, the Sumola case, is absolutely correct, and that this hearing should have been ordered. The judge knew this man had a problem. He did it partially, but he didn't do it all. He should have ordered the hearing. Roberts. Counsel, I think we understand your position. Perhaps we should hear from the guard. Thank you, Your Honor. And then you still have some rebuttal time. If it pleases the Court, my name is David Neidert. I'm a senior deputy attorney general, and I have the privilege of representing the respondents in this case. I'll address the issues in the same order that Mr. Turner did, just for ease of reference. Mr. Turner started by discussing the sentencing issue, which, as this Court is well aware, under AEDPA is viewed under a double standard of deference. First, you have the AEDPA standard that this Court explained in 1H v. Allen for how to evaluate claims of ineffective assistance of counsel. And you have, and after that prism, you have the deference the U.S. Supreme Court says is entitled in all claims of ineffective assistance of counsel, whether AEDPA applies or not, and that is the presumption that counsel is acting in an objectively reasonable manner. In this particular case, we had a case where the judge who was doing the sentencing had also conducted the trial, had heard all of the evidence, had reviewed various psychiatric reports, and then had the case remanded back to him for a new sentencing hearing because he had made what the Nevada Supreme Court had concluded was an error of law in refusing the stipulation to have him do the sentencing and instead insisting on having the jury do the sentencing. In this particular case, when the case came back, the defense attorney made an argument that the defense attorney did not call any witnesses, but the defense attorney did make an argument, and frankly, there's no case I'm aware of that requires defense counsel to call any witnesses at sentencing, and in fact, my experience in the Nevada courts is while it does sometimes happen, it's a fairly rare occurrence. The probation office recommended life with the possibility of parole? That's correct, although under Nevada law, a trial judge has complete discretion, he's not bound in any fashion by the recommendation of the Division of Parole and Probation. Did the pre-sentence report, is that what you called it in Nevada? Yes. Did the pre-sentence report analyze reasons behind its recommendation for life with parole? I don't believe it really did. I think the pre-sentence report in Nevada will do a description as it understands what the crime was. I'm not interested in would. I want to know what this one did. I don't believe that it really did. When was the last time you read it? It's been a while. So your memory, though, is there were reasons were not given? Yeah. But even if its reasons were given, its view is not binding on the trial. I understand that. I just wonder if that report would have been available to defense counsel prior to the sentencing hearing. Yes. The pre-sentence reports typically go to both sets of counsel several weeks prior to the sentencing hearing, so they have time to repair. So a defense attorney has an opportunity to take it to his client and make factual corrections if there are any made and things of that nature. Do you know if that was done in this case? There's no record as to whether defense counsel met with Mr. Cox prior to sentencing or not. Once the PSR is provided to defense attorney in advance of the sentencing, is it permissible for the defense attorney to talk with the probation officer? Typically, it is my experience in Nevada is that the – I think they're allowed to, but I don't think it really usually happens. Usually, if there's a dispute with respect to sentencing, it happens at the hearing. But there's nothing that I'm aware of in the law that prohibits a defense counsel from calling up the author of the pre-sentence report and saying, why did you do what you did? Yes. So you've got my drift. There was nothing to prevent this particular defense counsel from calling the probation officer who authored the PSR. And if there was no detail behind the recommendation for parole to find out the kinds of things that motivated the probation officer to recommend that. There was nothing that would prevent the defense counsel from doing that, although my experience is most defense counsel don't do that. It's interesting in this particular case that the defense counsel did contact the prison. It's pretty obvious because he makes the argument that he talked with Mr. Cox's caseworker, and it was part of his overall argument that Mr. Cox was doing very well in prison, that he was one of three people, according to the caseworker, who was ultra-polite and respectful to the prison authorities. So he did an investigation prior to the sentencing, obviously, by talking to the caseworker to get the caseworker's assessment of how Mr. Cox was doing in prison. Did he make the argument that giving a life without the possibility of parole would take away his incentive to behave properly? He did not make that argument, Your Honor. I think the gist of his argument was basically this from reading the sentencing transcript. His argument was Mr. Cox had been offered murder in the second degree by the Clark County District Attorney. He turned that down and went to trial and found guilty of first-degree murder. Second-degree murder in Nevada, there is no such thing as life without the possibility of parole. So his argument was basically the State at one point in time at least was willing to say that at some point in the future Mr. Cox should be eligible for parole, and he was doing well in prison, and so, Judge, don't penalize him for exercising his right to go to trial and sentence him to life without the possibility of parole. I think that was sort of the gist of the defense argument, if you read in the sentencing transcript. Was the net impression of this individual that he was crazy dangerous or just crazy? Whose impression? I think the impression of the sentencing judge was he was crazy dangerous, and I think that really was part of the judge's, when the judge made his comment at sentencing, I think that was very clear. He was saying, what I want is to make sure that there is not just one layer, but two, if Mr. Cox is ever going to get out of prison, because at that point in time, Nevada law, the Nevada State Constitution in fact has since been changed, but at that point in time, a sentence of life without the possibility of parole could be commuted by the Board of Pardons, and then once it was commuted, then he would be eligible for parole. The pardons procedure in Nevada is sort of unique in that the Board of Pardons is made up of the justices of the Nevada Supreme Court, the Attorney General, and the Governor. A majority of the Board of Pardons has to vote to commute a sentence, and the Governor has to be in the majority. So my sense is the judge was saying, if he's ever going to get out, we want to make sure the Board of Pardons thinks he's not dangerous before I trust the Parole Board with respect to this, because I think Mr. Cox is an extremely dangerous individual. I think those were the judge's, that was just the judge's comments, and I don't think there's any, with respect to ineffective counsel, if you go to the prejudice component of it, I don't think there's pretty much any evidence that could have been presented at that point in time that would have changed that judge's determination. Has the law been changed? So, I mean, at the time the judge made an assumption that his sentence could be commuted, and that was one of the bases of his decision? The Nevada Supreme Court has ruled that Nevada's commutation statute is applicable only to people who were sentenced for crimes that occurred after 1995, I believe, it might have been 1993. But for Mr. Cox's case, he still is eligible to go to the Board of Pardons at some point in the future and have a sentence of life without commuted to life with. But if he'd committed the murder a decade later and sentenced to life without, he would be doing life without. So that, so with respect to the sentencing issue, I don't think there's, I think there was no real prejudice, because I think the judge was aware of everything in this case, and was going to, and concluded that given Mr. Cox's mental illness and the issue and the judge's perception of future dangerousness, that the sentence was going to be life without the possibility of parole. I also don't think that given the fact that the records indicate that the defense attorney did investigate, he talks about going to California and talking to people, et cetera, that he did do an investigation. And so although there's no record on this, because it was never an evidentiary hearing, because the Nevada court called the claim conclusory, that there is evidence, or based on his own statements, that there was an investigation. And from that, we can at least infer that it was some tactical decision made, that while he talked to these people, he didn't see a particular reason to put on evidence. Counsel, what about the other issue, the sua sponte competency evaluation on the Miranda case? With respect to that issue, I don't think there's any clearly established Federal law that requires that. And that's basically sort of the end result. Mr. Turner talked a lot about all the facts leading up to it. But I don't believe that there is, the United States Supreme Court has ever said there's any kind of sua sponte duty for a court to protect a criminal defendant with respect to the Miranda rights. Johnston v. Zerbst is certainly in a posit in the sense that Johnston has to do specifically with a much more fundamental right of actually having an attorney. And Johnston v. Zerbst obviously was one of the long, long lines of cases that ultimately led to the cases that said that every criminal defendant has a right to have an attorney, regardless of their ability to pay. But with respect to this, I would respectfully suggest that, as a general rule, the United States Supreme Court has said, no, there's not a duty to do so. They said that in Wainwright v. Sykes. So now the question is, is there a duty in a special circumstance to intervene? And in this case, because the issue is not an effective assistance of counsel, I think we have to assume that counsel was acting in a reasonable manner in not doing so and not requesting any kind of hearing. And certainly one reason counsel certainly may not have been objecting is because he knew that his client was going to be testifying. Mr. Turner speculates, while he might not have testified if the statements had not come in, an opposite inference could also be that he knew his client was insisting on testifying and he made a decision that here's what we had. We had a situation where he had a client who was going to give an absolutely bizarre story as to what had happened. And this absolutely bizarre story, the jury is going to be reasonably asking itself, so when did this guy have a chance to make up a story this strange? And by having the people testify that this was his story from day one, that Mr. Cox was acting in a bizarre manner and giving the same strange story over and over and over, certainly could go to the jury with the impression it wasn't just something he was making up. The defense that was presented in this case was self-defense. Mr. Cox's attorney asked for a complete acquittal. I think he would have been very, very happy if he had somehow gotten Mr. Cox convicted of voluntary manslaughter or some lesser charge. But certainly when that's going to be your defense, self-defense is sort of one of those hard defenses that while no defendant is ever required to testify, it's a very, very hard defense to put on if the defendant doesn't. So I think the inference can certainly be based on the defense that was used in this case, that these statements given to various law enforcement officers were sort of going to bootstrap into the statements that he later made to show that this was not something that he made up while waiting for trial, but was something that actually he'd been saying from day one. Anything further, counsel? No, Your Honor. I believe I've said what needed to be said. I would ask the Court to affirm the district court in this regard. Thank you, counsel. Mr. Turner, you have some reserve time. Thank you, Your Honor. First of all, I would like to note that the PSR, the one I'm familiar with, the first one, is at excerpts of record, page 674, and there is no explanation, in my judgment at least, of why they went with life with. It's a good question. And my background is not as a criminal lawyer in Nevada, but I have appeared I have sat with a parole officer doing the interview for a PSR, and I have actively talked with that person. So as Mr. Neidert indicated, there obviously is no reason that couldn't have been done. In fact, that probably every lawyer should do that. That should be fundamental. But in any event, this PSR was in the record at the time of sentencing. Yes, it was. The second PSR, to be real honest, I don't recall ever seeing that. I think that's speculation on my part, but I think I can honestly say that the second would tend to be very similar to the first, probably with an update of anything that occurred since then, but I've never seen it, so I can't speak to that. The one thing that's interesting, Mr. Neidert indicated, I believe he said, that the Sixth Amendment right to counsel has, under the reserves, somehow is more important than the Fifth Amendment that we're talking about here. Interestingly, dissenting in the Minnick case, which is cited in our briefs, Minnick, Justice Scalia, dissenting in that case, indicated that, I'm quoting on page, let's see if I can tell the word, page 160 of that opinion, he says, We have adhered to the principle that nothing less than the Zerp standard for the waiver of constitutional rights applies to the waiver of Miranda rights. So at least Justice Scalia thinks they're equivalent, and I would submit that they indeed are equivalent. I don't know of any lesser standard for the Fifth Amendment than the Sixth. The Pardons Board, referenced by the judge, by the way, in sentencing, he references Pardons Board as what he thought where this should go. That's a very telling reference, because that sort of characterizes this as a future dangerousness situation, because that would be sort of the difference between a parole versus Pardons Board. And as I've said previously, the key here is that this lawyer put on no expert testimony about that subject of dangerousness. That's just fundamental lawyering. That's nothing exotic. And that's our bottom line on this. That's got to be ineffective for not putting on an expert to tell the judge that this man can be healed. And if you look at the opinion, I'm sorry, at the report of Dr. St. Martin, he flat out indicates that this man could be rehabilitated, that a delusional disorder of this kind can be addressed by medication. And that would be a fundamentally important fact, and that was in this case. I believe that's all I've got, Your Honor, unless the Court would have any other questions for me. Roberts. No further questions. Thank you, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Hawkins, Wardlaw